## STATE ex rel. HARDESTY et al. v. SPARKS et al.—
## 190 S. W. (2d) 302.

Eastern Section. June 28, 1945.

Petition for Certiorari denied by Supreme Court, October 6, 1945.

Reuben H. Nichols, of Knoxville, for plaintiff in error.

J. Arthur Atchley and Hugh C. Simpson, both of Knoxville, for defendants in error.

BURNETT, J. This action was begun by the husband of his deceased wife seeking the custody of her two year old son. The defendants answered and petitioned the court to adopt the child. The adoption petition was filed by a maternal uncle and his wife.

The trial judge granted the petition for adoption and the husband has appealed to this court and assigned error.

Joseph M. Hardesty, Sr. (husband and plaintiff-in-error), married Dortha Sparks on August 27, 1942, after a few days acquaintance with her. On December 2, 1942, she gave birth to a son, who was named Joseph M. Hardesty, Jr. Hardesty, Sr., knew Dortha was pregnant when he married her. He knew he was not the father because he had not known her until a few days prior to their marriage which occurred ninety-eight days prior to the birth. He nevertheless gave this child his name and in every particular acted as a natural and normal father

to the child. On January 25, 1944, Dortha (the mother and wife) died at an Army Post Hospital in the State of Florida. The husband had the body embalmed and sent to Knoxville, Tennessee (the home of her people), for burial. He followed the body to Knoxville by train and bus arriving in Knoxville a few hours after the body arrived. He brought the baby boy with him and went direct to the home of his wife's parents with the boy.

The plaintiff-in-error stayed at the home or homes of his wife's relatives for a few days until after the funeral of his wife. When he had started to his deceased wife's parents' home after the baby his wife's brothers met him on the way and held him up at the point of a loaded shot-gun. They searched him, taking all his papers and other valuables, would not allow him to make a statement, and told him to head in the other direction. Before going they gave him back his furlough papers. Several months later, through the legal assistance officer of the camp in which the plaintiff-in-error was stationed, all other papers and valuables were returned except pictures of his deceased wife. Wade Sparks, one of the petitioners in the adoption action, was the one who held up the plaintiff-in-error with a loaded shot-gun.

After being held up and run off the plaintiff-in-error returned to this army base and reported the above facts to his commanding officer. The legal assistance officer of this camp conducted an extended conference with the defendants-in-error and their counsel about these matters and in an effort to get the defendants-in-error to return the baby boy to this plaintiff-in-error. When they would not voluntarily return the baby the petition for habus corpus was filed herein.

Hardesty, Sr. (plaintiff-in-error), is in the United States Army where he has been for seven years. He has

held the rank of Sergeant a greater portion of this time. He proposes to keep the child in the home of his sister and brother-in-law during the period of his enlistment. The sister and brother-in-law came to Knoxville, Tennessee, from Oklahoma City, Oklahoma, and testified herein to their willingness and desire to have custody and care of this baby. The brother-in-law says:

"I came here, if it is possible, to take the child back to my home and take care of it as if it was mine, for the simple reason Joe Hardesty is my pet brother-in-law, and the fact is he has spent much more time with me than with his parents. I find him a wonderful kid. Each time he gets a furlough, he usually spends it at my house. I do feel that I can take care of the kid as well as anybody else. . . .

"I bought a home that is strictly modern, right in town. I feel I can take care of the child as it should be. I can send it to school, there is a school close, a street car right in front of my house; we have a bus line, we have taxi service. There is no reason why the kid would not have just as good as any other. In other words, I can take the child away from where its mother's name was dragged down to nothing. I don't feel the child should be raised in a community where everyone knows the child by name. . . ."

On cross-examination, he says: "Well, he paid the bills when it was born; it was born under his name; its mother was his wife; he sat up and carried the child nights, when no other person in the world would, when it cried and was sick. I don't see why he should not have it."

The sister and brother-in-law of the plaintiff-in-error have been married for fifteen years. They have no living children. The brother-in-law is an oil driller and has lived around in various parts of the United States follow-

ing his profession. At the time of the hearing he had purchased a nice home and felt he was permanently settled—that his present work was in the production end of the oil game and would not require his running over the country. Their home is near a kindergarden, grade schools and a church. No blemish is here shown against them.

The defendants-in-error (adopting petitioners) live in Knox County on a small acreage. They own other acreage in the county which is rented. There is a church and school within a mile of their home. They live in a good community reasonably near good citizens. Their home is the average country home of people of their financial standing. Wade Sparks, adopting petitioner, is a trucker, i. e., he buys cattle and sells them and hauls various things, for those who desire such work. The trial judge remarked that his wife (joint petitioner in adopting petition) made an excellent impression on him. It is shown herein that Wade Sparks was involved in liquor traffic many years ago. It is shown that very recently he was involved in the sale and transfer of counterfeit sugar stamps. His explanation of this last episode was that he took these stamps as a pledge for a loan of $25 to one "Red" who lost all his money in a poker game at Ellija, Georgia. That when his loan was not paid he took the stamps to a merchant who disposed of them and gave Sparks $125 for his part or for the stamps. Sparks' wife says he makes $3,500 per year yet he has never filed an income tax return.

The Sparks' excuse for the shot-gun episode herein related is that they were suspicious that their sister, the wife of the plaintiff-in-error, had been murdered by him. This suspicion seems to be unfounded. If there had of been any likelihood of this we feel that the Army Post

where she died would have made some investigation of the matter and would not have been so interested over a period of a year in aiding him in his controversy with his wife's people. The Sparks say too that the plaintiff-in-error only wants the baby to use as an excuse to get a discharge from the army and that he gave them the baby because there was none of his blood in it. The preponderance of the evidence indicates this contention is true but any statements of the kind were made at or near the funeral of his wife and were made under such a stress that they should be greatly discounted. All the acts of the plaintiff-in-error subsequent to the time made indicate an entirely different attitude. As has been well said by Cardozo, Judge, in Re Bistany, 239 N. Y. 19, 145 N. E. 70, 71, 72: "They may have weakley hesitated. They may have foolishly delayed. They may have drifted into a situation in which their desires and expectations were open to misconception. They may even have experimented a little, to test their own feelings. All that is not enough. They must be found to have renounced. The petitioners would have us hold that what began, so to speak, as a loan, was thereafter transformed into a gift, and this though a readiness to give has been explicitly disclaimed."

 The criterion before the court in this character of case is "what the true interests of the detained child require . . ." State ex rel. v. West, 139 Tenn. 522, 201 S. W. 743, 745, Ann. Cas. 1918D, 749.

 Under this record the acts of Wade Sparks, as heretofore detailed, certainly preclude him. On the other hand there is no showing that the step-father or his sister and brother-in-law are not morally fit to raise and nurture this child. They stand extremely high under this record and their attitude in the entire matter is greatly to be

commended. The reasoning of the brother-in-law, as above quoted, is unanswerable. On the other hand the purporting adoptive father admittedly commits a felonious assault on the plaintiff-in-error; he is admittedly profiting in bogus sugar stamps, and the general tenure of his ways do not warrant him having the custody and rearing of a boy. The Sparks, to say the least, do not show the right attitude when they drag their sister's name through the mud and bastardize this boy they ask to adopt. On the other hand the plaintiff-in-error and his family are making every effort to get away from this. The plaintiff-in-error shows a true love for this woman who was his wife regardless of her past errors of which he knew before marrying her. We have no doubt that Sparks' wife is a fine woman but any parent knows that in the great majority of cases a father will influence a son in the long run more than will the mother. Many character witnesses of unimpeachable integrity are offered herein for the Sparks. Apparently these witnesses are not cognizant of the facts herein developed for if they were we feel sure they would hesitate to testify as they have herein. It is not unusual that one bears an excellent reputation around his home while acts away will develop an entirely different character.

 The original habeas corpus action herein was filed on the theory that the plaintiff-in-error had the same rights as a natural father. This was on the well-established "principle that every child born in wedlock is presumed to be legitimate". 7 Am. Jur., p. 636. This presumption "may be overriden by clear, strong, and convincing testimony that there was no cohabitation between husband and wife 'during the period when . . . nature have been begotten.' " Gower v. State, 155 Tenn. 138, 290 S. W. 978, 980. The required proof is here of-

fered. This then changes the status of the plaintiff-in-error from that of a father to a step-father.

Error is assigned herein to certain testimony elicited from the plaintiff-in-error (husband) wherein it is said that it is through this testimony that the child is bastardized. There is a respectable line of authorities which hold that "neither the husband or wife would be permitted as witness to bastardize the issue of the wife." The reasoning of this line of authorities is vigorously attacked by Dean Wigmore in his noted work on Evidence, sec. 2063 et seq. It is not necessary for us to pass on the question here because of the manner of eliciting the evidence herein and because there is ample evidence on the subject to comply with the requirements in this state. The plaintiff-in-error did not voluntarily so testify, nor does he condemn his deceased wife for her acts—he has long since endorsed them—it is her own flesh and blood who so stigmatize her.

█ It is not necessary and we do not attempt herein to set forth the obligations of this step-father to this child. Whatever these obligations are he may cast them off at any time. 46 C. J., p. 1339. In view of this fact we feel that a petition for adoption should be filed herein by the plaintiff-in-error (step-father) or his sister and brother-in-law so that there will be a binding legal duty to this baby boy. This record clearly evinces their desire to have this obligation. Probably it was not done because up to the time of trial the plaintiff-in-error was presumptively the natural father.

For the reasons outlined herein the cause must be reversed and remanded for the purposes indicated. The parties will have an opportunity to offer additional evidence as to the character, standing and fitness of the plaintiff-in-error and his sister and brother-in-law if they

so desire, provided, of course, they file the indicated petition. This proviso is necessary because it was suggested in the argument that there had not been sufficient time for such an investigation.

█ It must be always borne in mind that the court may use "its discretion according to the circumstances of the particular case; the welfare of the child being the chief consideration." Baskette v. Streight, 106 Tenn. 549, 557, 62 S. W. 142, 144.

The case will be remanded. The costs of appeal are taxed against the defendants-in-error. The costs below will await the outcome there.

Hale and McAmis, JJ., concur.